I'd like to reserve three minutes, please. You may. May it please the court, my name is Sandra Hanshaw-Berink, and I'm here representing Terrance Fuller, the appellant in this case. Your honors, Mr. Fuller asked that this court reverse the district court's finding for two reasons. One, the district court improperly found that no genuine issue of material fact existed as to his failure to promote claim. And the second reason that the district court failed to find that any genuine issue of material fact existed as to his retaliation and race discrimination claim. This case involves, your honors, an employment case whereby my client, Mr. Fuller, an African-American, was employed by the appellee for seven years. During that seven-year time period, he was subjected to several racial comments. He was denied promotions, and then he was ultimately terminated. As you know, when this court reviews a district court's granting of summary judgments, the facts and the inferences are drawn in light most favorable to the non-moving party. As to my first point, the failure to promote claim, the district court failed to take into consideration the conflicting, the shifting, and the false reasons as to why for the position. As this court has held in the past, the falsity of the employer's proffered reasons, together with the prima facie case, can demonstrate intentional discrimination. And that's what we have here. An interview panel convened to interview the candidates, including Mr. Fuller. After the interviews were conducted, two individuals were recommended for the position. So am I right? There were a number of candidates, and then three were interviewed. Your man was one of the three, and there were two jobs. And so he did not, in fact, came in third. There were a couple other interviews, I believe. But yes, he was one of two final candidates that were not selected as well. So there were four interviews. Who was the fourth one? I don't know the name right off the bat. So you're just focusing on him compared to the two who did succeed. And the other two who were selected were Caucasian? That's right, they were Caucasian. And as well as the interview panel was all Caucasian. That's important to point out. Now, the interview panel created a memo as to the reasons why the two candidates were selected over all of the other candidates. That memo gave the reasons that the money handling, interview, and the customer service skills were the determining factors as to why the two Caucasian employees were selected over Mr. Fuller, the African-American. We can show that those reasons aren't the true reasons. The reason we can show that is when asked in deposition, each individual panel member gave differing reasons. One panel member, Janet Brown, couldn't articulate a reason as to why the other two candidates were selected, other than to say they gave better interviews. And this court has held that when we look at a subjective reason as to why a decision-maker made a decision, an employment decision, we have to look at that with close scrutiny, particularly when that individual is not a minority, which is the case here. The other second interview panel member, Mr. Steiner, said money handling, which was referenced in the memo. However, the third panelist, Mr. Dan O'Brien, testified that the Collins were, was the determining factor as to why Mr. Fuller was not selected. Well, as I mentioned previously, that's not even listed in the memo as a reason as to why Mr. Fuller was not selected. What's the record reference for the memo? Frankly, I had focused mostly on the depositions. So there's a written memo, and then the depositions take off from that memo? Yeah, the memo is going to be, give me one moment. It's record entry number 38-5, page ID number 341. Thank you. Yeah. So going back, Mr. O'Brien testified that the Collins, now the Collins reference, whenever an employee is off and they need a replacement, the appellee needs a replacement to come in to fill a position, they call individuals. So it's not a situation where the employee is calling in sick or saying they're not going to come into work. Well, from those Collins, a report is generated. So who's... I did look at your chart, and is it fair that large numbers of the non-working are because there was no answer? That is, I see an NA chart, and very large amounts of the time they simply didn't reach them. That's correct, Your Honor. And so maybe Miller had better phones or whatever. But Miller clearly came in much more often than either Lilliquist or your client. I would agree with that, Your Honor. But it's also important to point out that my client was held to a higher standard. And I say that because he was called substantially more than either of the two other individuals. Well, is there any evidence as to why that, I mean, sometimes that could be good in the sense if you want overtime or you want extra work, were all of these people were part-time at the relevant times? They were all temporary workers, all seeking the permanent position. But there's no deposition either way about why was one person called more than another? No. Okay. But I guess your point is, what, your summary exhibit shows that your client came in a higher percentage of the time than Lilliquist? Right. So that proves that. As far as Mr. O'Brien's reason as to why Mr. Fuller wasn't selected is false. It's simply untrue. Though isn't it correct that your number that he came in more often is lumping 09 and 2010 together? If you only look at 2010, then Lilliquist came in more often. Yes, I would agree with that. Okay. I would agree with that. But it's important to point out that the memo makes no mention. The memo which purports to give the reason as to why Fuller was not selected, the other two candidates were selected, doesn't make any mention of the call-in rates. The memo talks about money handling? Money handling, interview skills, and customer service skills. Okay. And then the question about the, he gave a wrong answer. That's just from the depositions. That's from a deposition. But also, Your Honor, that's a great point. It relates to the question of the interview skills, but at least it's not in the memo. It's not in the memo, but it's important because, you know, that came up after the fact, after my client filed his complaint with the Michigan Department of Civil Rights. That was never mentioned, especially, it's proven as... I'm sorry, when you say it came up after, what was the... It came up after in a memo that was drafted. But I mean, he filed the complaint after the memo was written. Yes, that's right. That's right. Let me ask you about the money handling. Am I correct there that there's no real dispute about the underlying number that is that your man had a higher, over, or under, though everybody's was quite low. His was .15, .10, .11. Is that, reading that correctly? I would agree with that, Your Honor, but again, I don't believe that that's dispositive of this claim. And I say that again because here we have shifting and conflicting and false reasons as to why he was not selected. It's very important going back to the interview question that was he purportedly answered wrong. I mean, we've proven that as being false because one of the interview panelist members, Dan O'Brien, said, no, he answered all the questions properly. It doesn't prove it's false. It maybe shows it's a jury question is what you're saying. Right. It doesn't prove it's false. But it does show that it should be left up to a jury to decide whether these reasons that were given were in fact the real reasons or just the pretext for discrimination. What about on the discharge stuff? I mean, your client was fired. Their reason given was he was filing false unemployment. Well, you know, yeah. It's true that he was found by the Unemployment Insurance Agency to have committed fraud. He disputes that he did that intentionally. You know, he's a believable guy, but for purposes of this, we can show that that is not the real reason that motivated the termination. And the reason I can show that is this. Dean O'Brien was found July 14, 2011, to have committed fraud by the unemployment. Same thing. Nothing happened. Nothing happened until after my client's issue with the unemployment fraud came about. So that shows disparate treatment, okay, but it's also further strengthened by the fact that the affidavit of Mike Belot, a former supervisor, who in his affidavit says, look, they never investigated these claims for unemployment. They never investigated them until my client's unemployment fraud came about. And they fired the white guy, too. They fired the white guy, too, but we can show disparate treatment. We can show that he was treated differently. Just because they fired your guy after three weeks, and they took, what, a couple of months with the other guy before it was since they? But the argument, Your Honor, is this. Had my clients not been found to have committed unemployment fraud, the white guy would still be working there. You don't know that. You're speculating on it. Well, we can support. They also fired a Melissa Brown. Four months later. Four months later. So there were three people that were fired for these false unemployment claims, two of whom were Caucasian. But. And that hurts your. It's not dispositive, Your Honor, and the reason I say that, again, is because we have evidence to show that he was treated differently. He was treated differently, but it's not just that. It's the affidavit. It's the proximity in time with him making a complaint of race discrimination. We've got three complaints of race discrimination within weeks of him being terminated. Were there any people earlier who had had these unemployment, because these findings were not by the bridge authority, right? They're by the state of employment. So were there people who had committed similar fraud, you know, a year earlier, three years? There's no evidence to that, no. Okay, so you've got, at best, you've got these several claims that happened all in the same timeframe. But it's also important to point out that Janet Brown, the same individual that's on the interview panel that can't articulate a reason as to why my client was not selected, she also handles the unemployment claims. So I think that's important to show the same person who has this discriminatory animus based on the facts is also handling the unemployment. All of a sudden, all of a sudden, my client is... Are you claiming that she falsified something? Not claiming she falsified anything, but we can tie the two claims together, him not being claimed. As amongst the different people, it sounded like it wasn't that she had discriminatory animus, she just had no memory of what she did or why. It was very subjective. And as I said, you know, when we look at a decision maker basing their decision on subjective factors, you know, we have to look at it with closer scrutiny as this court is held. Thank you, you have your three minutes for rebuttal. Good morning, your honors. Mike Dittenberg, Assistant Attorney General for the State of Michigan representing the Mackinac Bridge Authority. Employment discrimination laws like Title VII or like Michigan's counterpart, the Elliott-Larsen Act, have one overriding theme, and that's that employees in protected classes are treated the same as employees outside that class. And that's exactly what happened here. Here, three employees committed fraud  And Mr. Fuller was subjected to the same non-discriminatory animus or discriminatory criteria in the MBA selection for a promotion of similarly qualified candidates. For these reasons, the court should affirm the summary judgment in full. And before I get to Amir- How do you explain that it took so much longer for the Caucasian employees to be let go for the same reason? There's no evidence in the record to explain why there was that delay between Dean O'Brien and Mr. Fuller. However, in the past, this court has always looked to the ultimate employment decision and it's never sat as a super HR department to lead the employer through the investigation process. And even if there was, actually in this court, this court rejected a similar claim in the Gaffney case where there was approximately five weeks in between terminations for similar offenses. And this is only a couple of weeks longer than that. I would submit that that's not a material difference in that Gaffney controls here. And even if this court found that this difference was outside of Gaffney, Melissa Brown was fired on a very similar timeframe to Mr. Fuller and that was before this lawsuit was filed. So it can't be argued that this lawsuit motivated the MBA in that regard. And what's the story with Brown? I thought there was a longer period for her. Am I wrong on that? I thought that the fraud was in- When the fraud was committed and when the unemployment, because am I right that there's whenever the fraud, then there's a finding by the Unemployment Commission and they transmit that to you. Is that the sequence? That is correct, Judge Boggs. And if you look at record of entry 30-3, that is Melissa Brown's notice of fraud. And it shows that it was issued on January 11th, 2012. She was fired later that month. The notice of fraud, is that something by you or by the Unemployment Commission? That is something by the Unemployment Commission. So you say with regard to her, it would have been just from January 11th to January 23rd. Is that correct? 23rd or 25th, somewhere right around there, Your Honor. And I think the confusion is that when the unemployment agency sends out this notice, it retroactively terminates benefits back to when the fraud was committed. But they're finding that only at a later date. OK. And with regard to Dean O'Brien, who's different from Dan O'Brien, Dean O'Brien, there was two months between the Unemployment Commission finding and the firing? Yes, approximately. And again, there's no reason, there's no evidence in the record as to the cause of that delay. And under Michigan law, you would have to show that it's a pretext plus standard as the Michigan Supreme Court is held in town and this court stated in Hobson. And there's no evidence that, regardless of the reason that it was racially motivated. Talk about the lack of failing to promote Mr. Fuller, though. Seems like there is some conflicting reasons given by the three interviewers as to why, supposedly, he was denied the promotion. Certainly, Judge Boggs. First, I would note that that claim is. Excuse me, Judge Gilman. First, I would note that this claim has been brought only under the Michigan Act. It's been represented in the brief at page three and in the civil appeals statement. And what we have here is we have a number of part-time individuals applying for a full-time job at the same position that they've been, with the same duties, the same qualifications. So there is going to be some hair splitting between these candidates. And Michigan courts, when you have similar qualifications, Michigan courts defer to the employer's business judgment. And to say that they've been given shifting justifications, I think, is a bit of a misnomer because the overall reason has been the same. And then the individual panelists have sort of been each asked, but what broke the camel's back? That's not quite true. Dan O'Brien, one of the interviewers, said that, as far as he knew, Fuller answered all the interview questions correctly. Yet the other two say, no, that was one of the reasons we didn't select him because he missed one of the questions. I don't believe that the missed question was noted by any of the panel members. That was something by Bob Sweeney, who was the administrator, who didn't serve on the panel after the fact. That's never been our position in the litigation. You got it from somebody, right? I mean, if Sweeney said that, he had to have gotten it from one of the members of the panel. I thought that was the testimony. Did I get that wrong? That is the testimony, Judge Bowman. And so the overall reason, though, is that Mr. Fuller was not even that he was not as qualified, but he wasn't the best candidate for the position. And I don't think it's too hard to believe that different panel members could have different reasons in their heads for reaching this final conclusion. What's bothering me here is what's happened, of course, is if this were an appeal from a jury verdict for the Mackinac Bridge Authority, I would have no trouble saying, OK, that's whatever they decided was OK. The problem is summary judgment was granted to your client, which means that somebody says, as a matter of law, no reasonable juror could possibly find that his promotion was based on discrimination. The question is, can we really say that, or is this a proper issue to go to a jury? It's not a proper issue for a jury, because even if you take away the conflicting testimony over whether he answered a question wrong, there's still the call-in data. What about the call-in data? Isn't there an exhibit showing that Mr. Fuller actually came in more times than Lilliquist, and yet that supposedly was the reason that he was not selected? I think a fair reading of Mr. O'Brien's testimony at his deposition at pages 15 and 16, the only fair reading of that testimony is he was talking to his personal experience when he called in individuals. And you can take these cumulative statistics and stack assumption on assumption, but there's no evidence that Mr. O'Brien was referring to these numbers in the same way that Mr. Fuller's read them. Yes, if you look at 2009, 2010 in total, and you refer to the percentages, not the total number of incidents, then you can perhaps conclude that Mr. Fuller came in more, but there's no evidence that that's what Mr. O'Brien did. And if you look at the example call-in sheet, that wasn't filled out by Mr. O'Brien. Clearly there's other members at the Mackinac Bridge Authority that fill out these sheets. So just because if you sort of get this house of cards of, well, if you do this, this, and this. Was there anything from your side in terms of who did the calling and how it was done, or why do you call X rather than Y? Was there any deposition testimony as to that? No, there's not. And it's- Am I right that a lot of the questions of whether somebody came in or not was whether they were reached at all, whether the phone answered? Am I right, as your adversary said, that these NA on the chart just means there was no answer when you called them? That is plaintiff's chart, but I believe that is what is being referred to. Because the NA is also on the example slip, which they were presumably compiled from, right? Correct. So there's a slip when somebody makes that call. There are a number of factors that could affect that. Who's working at the time. These all had annual caps on the number of hours worked, so it could be who had reached their hours already by that point. I believe these were all very close in time to when the shift needed to be filled. They weren't calling a week ahead of time. And as you noted, it might be a benefit that you're called in more if you're given more opportunities to work. If you didn't call them in at all, we might have a different type of claim here. And- Let me ask you something here. There's all this derogatory racial talk alleged to have transpired in the workplace. I'm not aware that we have a claim of hostile work environment before it's on appeal here. But just in terms of as a matter of evidence, to what extent can the environment, the racial environment, and all this hostile or derogatory racial statements be taken into account just as a matter of evidence in evaluating this claim on failure to promote and or termination, for that matter? Well, what's the law on that? Do you know? Well, it would be relevant if it was made by a decision maker and relevant to the employment decision at hand, which is not the case here. All of the statements save for one were made by non-decision makers. And the one was made by Dan O'Brien, allegedly. There's no evidence in the record as to when it was made, whether there's any animus regarding that statement. Although I will agree it's an improper statement. It appears to be a ill-conceived humor or something. Skinny black man kind of thing? That is that one. And there's no evidence that this promote or not to promote. There's no evidence that either of the other panel members were. Well, of course, there's a lot more derogatory stuff than that used in the N-word. And it's not completely clear the extent to which management was aware or permitted that. But I mean, I guess that could be an open area of inquiry where it's a matter to go to trial. That's why I was asking just as a matter of evidence to what extent the environment, the racial environment there, could make a difference in evaluating whether there's a genuine dispute that should permit these claims to go to trial. Judge Clay, that sounds like a hostile work environment type claim to me. And they brought that in the district court. They chose not to appeal that. Well, yeah, they're not claiming hostile work environment. But there's an issue of motivation. And that, whether if you're claiming employment discrimination and discriminatory intent, then the issue of motivation comes in, even if it's not a hostile work environment claim. I agree that it can, again, if it's comments made by decision makers. Every time that Mr. Fuller filed a complaint or notified management, the complaint was investigated, there was discipline handed out when appropriate. There's certainly no evidence that Bob Sweeney harbored any type of animus. And he was the final decision maker for the termination claims. And again, even if you, there would be some question of fact as to Mr. O'Brien's motivation based on this one statement that occurred at an unknown time, there's no evidence that either of the other two panel members had any type of improper motivation. So even if you take away Mr. O'Brien's vote, there's still two votes. Who was the final decision maker on the promotion? The panel recommended, and Bob Sweeney did review the recommendation, but he didn't conduct any additional interviews. He pretty much relied on the panel, as far as we can tell. That would be a fair reading of the evidence. In going back to the promotion, even if we, there is still the money handling performance, which is an objective standard, which has been relied on the entire time of this litigation and prior to, ever since the memorandum. And that's objective. Mr. Fuller simply was not as qualified, or did not have as good of a record in money handling as the other two. And because this is an Elkrick claim, no reasonable juror could find that Mr. Fuller was more qualified than either of these other two. And because they would be, even if they are considered equally qualified, despite the various reasons given by the panel, under the Town v. Michigan Bell case, the Michigan Supreme Court would leave that to the business judgment of the NBA. Unless the jury believed that it was animated by discrimination. If they were. Even the money handling is pretty, if they had a 90% correct rate, and your client only had a 10% correct rate, they'd be a huge gap. But these are very small percentages, between 0.1, 0.11, 0.15, those are not vast differences in money handling, is it? They're not vast, but the NBA employs a performance threshold of 0.014. And so Mr. Fuller was the one below that threshold, and the other two were above that threshold. That's never been challenged as an arbitrary threshold, that's just their performance threshold. Is there any evidence on how generally the toll collectors do, in other words, other than just these three, and what's the spread of how people do on the bridge? I believe that the. I mean, for example, is every employee who's full time stay under that threshold? That would look one way, as opposed to, you know, people are kind of all over the lot, they don't get real high, but they're a fair range. I just didn't know if there was any evidence on that. I believe the best evidence would be the collector assessment report at record 26.2, which I believe lists all the employees for that calendar year. And I see my time's about up. I would like to mention that the Title VII claims for termination or retaliation were filed untimely, because they were filed more than 90 days after the EEOC issued its letter to sue. Can you tell me, do you know offhand that 26.2, I mean, that's good, that's a good piece of information. What does it say? That is, are there people who were above that threshold? I believe there were both above and below. I don't know where the cutoff is, if it's half or a third. I can look at it. Thank you. Thank you, your honors. Your honors, I'd like to follow up on your questions regarding the racial comments that were made, the N-word, what's up, Mr. Skinny Black Man, which was made more than one occasion by a decision maker on the interview panel, as well as comments about his skin color. That is circumstantial evidence of discrimination. And we can use that as showing pretext plus, as counsel suggested, for his termination claim. So in reference to the Gaffney case cited by Mr. Dittenberg, this case is stronger. Because not only do we have that disparate time between the termination, we have additional evidence. We have these racial remarks, these derogatory comments. We also have the proximity in time. And this court has held in Mickey that protected activity plus adverse employment action that are near in time is evidence of discrimination. So we can show that pretext plus that's been referenced. But in addition to that, we also have the affidavit of Mike Belot that says, look, the unemployment wasn't even investigated in the past. So I think those factors together. You say it wasn't even investigated in the past. Again, this is coming from the Unemployment Commission. Was there something that the MBA reported to the unemployment? What I reference by that is what happens is that the state of Michigan sends the reports to the MBA. And the MBA is the one that investigates them. So Mr. Belot, a previous supervisor, said they would get those reports. They wouldn't investigate them. And I think that's clear by the situation with Dean O'Brien. Also going to the business judgments, as stated in Wexler, that's not an absolute defense. Combined with the other factors that we've previously discussed, that the business judgments, along with the discriminatory comments, along with the shifting reasons as to why he wasn't selected, definitely showed discrimination took place. So in closing, your honors, this case is one that should have gone to the jury. There are just too many genuine issues of material fact. It should have been left up to the fact finder to make a decision as to whether discrimination truly occurred, whether retaliation truly occurred, especially given that three complaints were made within weeks of his termination. And I also want to correct one fact, is in July of 2011, Mr. Fuller, which was weeks, eight weeks before he was terminated approximately, complained to his supervisor, look, these comments are being made. Something's got to be done about this. It stopped there, meaning it wasn't investigated. So it's incorrect to say that all of his complaints were investigated because his July 2011 complaint was not investigated. Let me ask you this. Who were the decision makers who made racial comments or the decision makers who failed to investigate complaints about racial comments? The only decision maker who made a racial remark, which was the, what's up Mr. Skinny Black Man, that was repeatedly made when greeting Mr. Fuller, was Dan O'Brien. And his decision related solely to the failure to promote. Mr. Fuller's supervisor, Mr. Steiner, was a decision maker on the promotion, but the complaints came after the interviews. So our position is, look, Mr. Fuller made a complaint in July of 2011. These complaints, these derogatory complaints, they have to stop. And instead of investigating, nothing was done about it. Those were made to, I mean, the complaints were made to Ms. Brown as the HR person? Well, that would be the, okay, so July 2011, a complaint was made to the supervisor. September 8th-ish, the complaint was made, a verbal complaint was made to Ms. Brown, the HR liaison, which was followed up by a written complaint on September 12th. What you called the supervisor in July, what person was that? Dean Steiner. That was to Steiner. That was Steiner. All right, thank you. Thank you. Counsel, that case will be submitted. And the clerk may call the next case.